## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JAKE DEAN SPURLOCK,

     Plaintiff,

v.                                   CIVIL ACTION NO. 3:20-cv-00650

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

     Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Jake Dean Spurlock ("Plaintiff" or "Claimant") seeks review of the final decision of the Acting Commissioner of Social Security ("Defendant" or the "Commissioner") for the Federal Social Security Administration (the "Agency"). The Commissioner's final decision denied Claimant's applications for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. (ECF No. 2.) By standing order issued on January 4, 2016, and filed in this case on October 5, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's Brief in Support of His Motion for Judgment on the Pleadings (ECF No. 18) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 21).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse or remand the Commissioner's decision (ECF No. 18), **GRANT** the Commissioner's request to affirm her decision (ECF No. 21), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant alleges that he became disabled on August 22, 2013, due to, *inter alia*, vision problems, back problems, pain, seizures, low blood platelets, numbness in his extremities, major depressive disorder, anxiety, paranoia, and other mental health problems. (Tr. 621.) Claimant was 35 years old on the date of his alleged disability onset and 41 years old on September 11, 2019, the date of the decision by Melinda Wells, an Administrative Law Judge "ALJ" for the Agency.[1] (Tr. 157; 733.) Claimant graduated from high school and completed one year of college. (Tr. 386.) Most recently, he worked as a custodian for the Lincoln County Board of Education; he has also been employed as a sheet metal worker for construction companies and as a material handler. (Tr. 387; 603.)

Claimant filed his application for benefits with the Agency on November 6, 2017. (Tr. 444.) His claim was initially denied on May 7, 2018, and again upon reconsideration on June 18, 2018. (Tr. 445, 486-87.) Thereafter, on July 17, 2018, Claimant filed a written request for hearing. (Tr. 512-513.) An administrative hearing was held before ALJ Wells on July 24, 2019, in Huntington, West Virginia. (Tr. 381.) On September 11, 2019, the ALJ rendered an unfavorable decision. (Tr. 143-157.) Claimant then sought review of the ALJ's

---

[1] All references to "Tr." Refer to the Transcript of Proceedings electronically filed in this action via the Court's CM/ECF system at ECF docket entry number 15. (ECF No. 15.)

decision by the Appeals Council on September 20, 2019. (Tr. 570.) The Appeals Council granted review and considered additional documents submitted by Claimant. (Tr. 1-10; 571-74.) On August 20, 2020, the Appeals Council issued a Decision determining that, consistent with the ALJ's findings, Claimant was not disabled under either section 1614(a)(3)(A) or sections 216(i) and 223(d) of the Social Security Act. (Tr. 1-10.) Thus, on that date the ALJ's decision became the final decision of the Commissioner, and, hence, the Agency's final decision for purposes of judicial review. *See* 20 C.F.R. § 422.210.

Claimant initiated this civil action on October 2, 2020, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer and a transcript of the administrative proceedings. (ECF Nos. 14 and 15, respectively.) Claimant subsequently filed his Brief in Support of His Motion for Judgment on the Pleadings (ECF No. 18), and in response, the Commissioner filed her Brief in Support of Defendant's Decision (ECF No. 21). As such, this matter is fully briefed and ready for resolution.

### B.    <u>Relevant Medical Evidence</u>

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

On August 22, 2013, the date he alleges that he became disabled, Claimant presented to the Cabell Huntington Hospital Emergency Room. (Tr. 950, 975.) Claimant reported that he drove himself to the emergency room due to a workplace injury sustained while installing duct work. (Tr. 950, 975.) At the time, Claimant was working as a union sheet metal worker for Mechanical Construction. (Tr. 950, 975.) Claimant reported that the injury was caused by tripping over a pipe as he helped carry a heavy exhaust fan. (Tr.

837, 950.) Claimant was evaluated and released with a prescription for hydrocodone (a pain relief opioid), and Flexeril (a muscle relaxant). (*Id.*)

Approximately one week later, Claimant presented to Short Chiropractic reporting that he was not improving. (Tr. 950-51.) Short Chiropractic began providing chiropractic therapy and subsequently ordered imaging. (Tr. 829.) An October 8, 2013 thoracic MRI displayed mild superior endplate deformity at T6, shallow right central and posterolateral disc protrusion at T5-T6, and a shallow right posterolateral disc protrusion at T6-T7. (Tr. 960.) Radiology observed no stenosis. (*Id.*) Likewise, the radiology report from a thoracic x-ray performed on December 12, 2013 displayed a stable superior endplate deformity at T6 and mild S-shaped scoliosis of the thoracic spine present. (*Id.*)

On December 12, 2013, Claimant presented to St. Mary's Neurosurgery on referral from Short Chiropractic for a neurosurgical evaluation. (Tr. 827.) Claimant reported that the August 22, 2013 injury occurred while "[h]e was doing heavy lifting, he fell and felt a pop in his back [and] has had persistent back pain since." (*Id.*) Claimant further reported that while his pain had "improved significantly," he still experienced "stiffness in the back." (*Id.*) Based upon MRI and x-ray imaging Claimant was diagnosed with a mild T6 compression fracture that did not require surgical intervention. (Tr. 829.) Claimant was recommended non-steroidal anti-inflammatory drug ("NSAIDs") as needed and ordered to continue with conservative therapy. (*Id.*)

On January 23, 2014, Claimant presented to St. Mary's Medical Center Pain Relief Center on referral from Short Chiropractic to discuss his possible candidacy for a thoracic diagnostic facet injection at the level of his compression fracture. (Tr. 959, 975.) The injection treatment was delayed due to skin flaking on the injection area caused by psoriasis, but Claimant was recommended to undergo twenty physical therapy sessions

4

approximately two to three times per week for the thoracic back pain complaints. (Tr. 975, 987.) On January 31, 2014, Claimant presented to Short Chiropractic for follow up, where he reported continued issues with range of motion and pain while seated; Claimant was likewise referred for six weeks of physical therapy. (Tr. 1296-97.)

Claimant followed up with the Pain Relief Center on March 6, 2014, where it was noted that his psoriasis had improved potentially due to his report that he "has cut back on how much he drinks per week." (Tr. 975, 977.) Claimant was informed that the facet injections would be an option if his psoriasis continued to clear, and it was noted that Claimant "wants to continue with his decreased alcohol usage in order to possibly be a candidate for this in the future." (Tr. 978.) In the meantime, the treater recommended Claimant continue with physical therapy. (Tr. 987.)

On April 10, 2014, Claimant presented to Huntington Physical Therapy ("HPT") for an initial evaluation and reported back pain and burning pain from his right buttock extending to his toes. (Tr. 838.) He also reported a medical history of dizzy spells that preceded the workplace injury. (*Id.*) Following Claimant's evaluation, HPT recommended therapy consisting of three visits per week for six weeks. (Tr. 841.) Subsequent May 5, 2014 progress reports from HPT indicated that Claimant was performing within the medium physical demand level and was undergoing work conditioning to progress to the heavy physical demand level. (Tr. 1228-29, 1237.)

On June 3, 2014, Claimant presented to St. Mary's Medical Center Pain Relief Center for follow up. (Tr. 959.) He reported intermittent right-sided thoracic back pain that "really only bothers him when he has to move his whole arm in an extended position." (*Id.*) He denied any new pain complaints or numbness, tingling, or muscle spasms. (*Id.*) Claimant was prescribed an increased 100 mg dose of Tramadol as well as 4 mg of

Zanaflex at bedtime, and ordered to continue with physical therapy. (Tr. 959-60, 1117.) Also on June 3, 2014, Short Chiropractic referred Claimant to HPT for work conditioning.

Claimant presented to Short Chiropractic for follow up on July 15, 2014. (Tr. 1080.) It was noted that Claimant completed physical therapy and was not approved by workers' compensation for any more visits for the work conditioning program. (*Id*.) Claimant reported that he "has been working around the house trying to build up his strength by doing the exercises he was shown." (*Id*.) The treater indicated "[t]he goal is to return to work next month, four weeks from now." (*Id*.)

Claimant presented to the Pain Relief Center for a follow-up visit on December 11, 2014, with a chief complaint of mid-back pain. (Tr. 950.) Treatment notes indicate Claimant was back to daily work and "out of his work hardening program and physical therapy but at this point does not feel that he can return to his full duties." (Tr. 950-51.)

On December 11, 2014, Claimant presented to St. Mary's Medical Center Pain Relief Center for follow up, where it was noted that he requested a "stronger" narcotic medication. (Tr. 959.) Consequently, the treatment plan concluded:

> We will not increase this gentleman's medications. He is on the maximum amount of controlled substances that we are willing to provide. I have explained to him thoroughly today that from now until the time of his injury, that his injury should be improving and not worsening. The compression fracture was mild; however, he is very adamant that his pain has increasing and wants an x-ray. I did review records from the neurosurgeons at which time they did say that could obtain an x-ray. I will send authorization today for an x-ray of the thoracic spine. AP and lateral views to check the stability of the compression fracture. I have very little else to offer him. He has failed NSAIDs. The tramadol, he tells me, is not very beneficial. I have advised him not to take the medication if it is not helping. We will see what the x-ray shows.

(Tr. 996.) Claimant was also advised that he could have his primary care physician take over prescribing his medications "to keep him from having to come to office visits here

[at the Pain Relief Center] every three months[.]" (*Id.*) Subsequent January 13, 2015 x-ray images indicated "[n]o change in superior endplate deformity of T6." (Tr. 1006.) Further, "[n]o new fracture is seen compared to" the prior December 12, 2013 imaging. (*Id.*)

On January 19, 2015, Claimant presented to his primary care physician for a wellness examination and was noted to be oriented to time, place, and person, with normal speech and affect, euthymic mood, and no psychiatric disorders, no memory lapses, impairment, or loss, no psychological symptoms, no anxiety, and no depression. (Tr. 1649-51.). Additionally, during this visit and several follow-up appointments, Claimant was noted to have normal joints, balance, gait, stance, musculoskeletal strength, and deep tendon reflexes, with no neurological symptoms, vision problems, muscle weakness, soft tissue swelling, or localized joint pain. (Tr. 1649-51, 1655, 1659, 1663.) Claimant reported no difficulty with balance, no dizziness or tremor, and no numbness. (*Id.*) On September 15, 2015, Claimant presented again to his primary care physician and reported that he had mild intermittent pain and rarely used medication; he reported no musculoskeletal symptoms and his balance, gait, and stance were normal. (Tr. 1668-70.)

On May 11, 2016, Claimant was treated at Generations Physical Therapy ("GPT") with diagnoses of lumbago, abnormality of gait, and lack of coordination. (Tr. 1625.) The treatment plan was two physical therapy visits a week for six weeks. (Tr. 1626-1639.) Following this treatment, Claimant reported still having pain in his back but he noticed an increase in balance and strength. (*Id.*)

On July 13, 2016, Claimant presented to his primary care physician at St. Mary's Family Care to follow up on recent complaints of abdominal pain and constipation. (Tr. 2245.) Though he had complaints of joint pain and stiffness bilaterally in his hands,

elbows, shoulders, and knees, Claimant reported "feeling fine" since his last visit with no musculoskeletal symptoms, soft tissue swelling, or difficulty with balance. (Tr. 1707, 2247.) Likewise, Claimant reported "feeling fine" on five subsequent follow-up appointments. (*Id.* at 2250, 2259, 2264, 2269, 2273.)

Claimant presented to SMFC on November 22, 2017, and was treated by Dr. Saxe. (TR. 1858.) A thoracic MRI without contrast was performed and showed Claimant had a history of mild back pain. (*Id.*) There was no acute fracture or subluxation in the impression. (*Id.*) There was a mild chronic depression of the T6 superior endplate. There was a Schmorl node of the T11 superior endplate. (*Id.*)

Claimant presented on September 15, 2017, at Short Chiropractic with pain in the low back and neck. (TR. 2417.) The assessment was cervicalgia, pain in the thoracic spine, low back pain, and other myositis. (*Id.*)

An electromyography report and nerve conduction study were conducted on December 11, 2017, at SMFC. (TR. 2403.) It was noted at that time that Claimant had complained of numbness and a tingling sensation in the last two digits of both hands for the last two months. (*Id.*) The impressions were mild carpal tunnel syndrome on the right hand, and mild bilateral ulnar neuropathy with unspecified site at the elbow. (*Id.*)

On January 15, 2018, Claimant sought treatment at SMFC. (TR. 2377.) A lumbar MRI was conducted for right leg numbness. (*Id.*) The conclusion was low grade degenerative disc disease that was more prominent at L4-5, where there was diffuse disc bulge resulting in bilateral lateral recess and neural foraminal narrowing. (*Id.*)

Claimant sought treatment at Short Chiropractic on April 23, 2018, reporting that he had developed pain which had started in the center of his back and radiated out to his hips. (TR.2412.) Claimant reported that walking increased his discomfort. (*Id.*) The

assessment was intervertebral disc disorders with radiculopathy - lumbar region, low back pain, pain in thoracic spine, and other myositis - unspecified site treatment. (*Id.*)

On May 22, 2018, Claimant presented to his chiropractor and reported experiencing pain mostly when bending over. (Tr. 2406.) Claimant reported that his low back pain had made activities of daily living, such as putting on his shoes, difficult. (TR. 2410.) The assessment was intervertebral disc disorders with radiculopathy - lumbar region, low back pain, pain in thoracic spine, and other myositis - unspecified site treatment. (*Id.*) The plan included an ultrasound, high volt electrical stimulation, and spinal adjustments. (*Id.*) Claimant was treated with ultrasound, electrical stimulation, spinal adjustments on May 16, 18, and 22, 2018. (TR. 2406, 2408, and 2410.) He continued receiving this conservative treatment during 2018. (*Id.* at 2406-2416.)

On May 30th, 2018, Claimant presented to Cabell Huntington Hospital with complaints of dizziness, weakness, fatigue, and decreased activity. (TR. 2421.) The diagnosis was thrombocytopenia dehydration. (TR. 2424.)

On August 16, 2018, Claimant presented to the Cabell Huntington Hospital Pain Management Center ("CHHPM"), with reports of low back pain, dull leg pain, burning, aching, and squeezing, and feet pain that was sharp and stabbing. (TR. 2555.) The pain increased during bowel movements, coughing, bending forward, bending backward, lying and reclining, standing, walking, sitting, and driving/riding in a car. (*Id.*) He had skin tenderness over the painful areas and a burning sensation over the painful areas. (*Id.*) Claimant reported that the pain radiated from the right leg to the first two toes, and he had numbness occasionally. (TR. 2556.) Claimant stated he was interested in receiving injections for pain relief. (Tr. 2555-56.) Recent x-ray imaging was noted showing a mild deformity of the L5 vertebral body likely related to limbus vertebrae or old healed

fracture. (Tr. 2558-64.) A CR spine lumbar with flexion and extension revealed that vertebral body heights were maintained, and there was no acute bony abnormality, subluxation, or instability on flexion-extension. (TR. 2558.) The assessment was sacroiliac joint dysfunction of both sides with more on the right, piriformis syndrome of right side, myofascial muscle pain, and coccydynia. (TR. 2559.) The right sacroiliac joint seemed to be the main cause of pain, but it could not be distinguished from the lower facet. (*Id.*) The treatment plan was sacroiliac joint injections, right piriformis injections, to consider radio frequency facet rhizotomy in the future if the above blocks provide pain relief, and to consider trigger point injections in the future for the myofascial component of the pain. (TR. 2560).

Claimant received sacroiliac joint injections on September 19, 2018 at CHHPM. (TR. 2586.) A mandibular nerve procedure was conducted on October 16, 2018 at CHHPM. (TR. 2590.) The diagnosis was piriformis syndrome of the right side. (*Id.*)

Claimant sought treatment at Scott Chiropractic on September 21, 2018 due to restrictions demonstrated in the cervical and lumbar spine found in the active range of motion testing. (TR. 2569.) The examination revealed a significant decrease of normal range of motion. (*Id.*) The diagnostic impressions were segmental and somatic dysfunction of lumbar region, intervertebral disc disorders with radiculopathy - lumbar region, segmental and somatic dysfunction of thoracic region, pain in thoracic spine, low back pain, other myositis - unspecified site, and segmental and somatic dysfunction of head region. (TR. 2570.) The goal was to increase ability to perform activities of daily living and decrease pain. (TR. 2571.)

Claimant presented at Huntington Foot and Ankle Clinic on December 14, 2018 and January 11, 2019 reporting bilateral heel pain that was most intense when walking

and standing, as well as stiffness in feet, numbness in feet, and back pain. (TR. 2605-06.) The assessment was plantar fasciitis and Achilles tendonitis. (*Id.*) The plan was to wear splints at night. (*Id.*) At Family Care Center (FCC) on January 14, 2019 Claimant reported weakness and numbness of legs bilaterally. (TR. 202.)

On April 18, 2019, a complete bilateral CR of the hands was conducted at CHHPM. (TR. 267.) The diagnosis was arthralgia of multiple sites. There was no evidence of acute fracture of dislocation bilaterally. (*Id.*) There was diminished joint space. (*Id.*)

Dr. Aljasmi treated Claimant on April 18, 2019, at the Erma Byrd Center with complaints of generalized pain as well as paresthesia; electromyography and nerve conduction velocity testing revealed numbness in the distal lower extremities and diminished grip. (Tr. 185.) The assessment was generalized pain that was likely multifactorial including osteoarthritis, compression neuropathies, possible peripheral neuropathy, possible sleep disorder, piriformis, and sacroiliitis joint dysfunction. (TR. 187.)

On May 30, 2019, Claimant reported to the WomenCare, Inc. FamilyCare Primary Care Center ("FCC") for a follow up regarding numbness and weakness in feet that seemed to be getting worse along with new numbness in hands. (TR. 2756.) He reported arthralgias joint pain, back pain, weakness and numbness of legs bilaterally, and numbness in hands bilaterally. (*Id.*)

At FCC on July 16, 2019, Claimant had complaints of pain in his feet, weakness and numbness of legs bilaterally, generalized anxiety disorder, alcohol dependence, and attention deficit hyperactive disorder. (TR. 202.) The plan was to follow up with a hematologist, dermatologist, and a urologist. (TR. 166.) The assessment was attention-deficit hyperactivity and generalized anxiety disorder. (TR. 202.) The active problems on

July 23, 2019 at FCC were attention deficit hyperactivity disorder, generalized anxiety disorder, chronic back pain, primary erectile dysfunction, psoriasis, reduced libido, cirrhosis of the liver, thrombocytopenic disorder, vitamin D deficiency, intermittent explosive disorder, and alcohol dependence. (TR. 168.) The plan was to increase valium to 10mg and return in four to eight weeks.

Claimant presented at University of Kentucky Medicine Specialties for joint pain on September 9, 2019, where it was noted that he had a history of neuropathy, anxiety, cirrhosis due to alcohol, and thrombocytopenia. (TR. 118.) He reported that the neuropathy pain started in 2013 and was present in bilateral hands, low back, knees, feet, and ankles. (*Id*.) Claimant reported that the neuropathy pain in his hands has worsened over the last six months, his hands felt stiff, and his fingers were swollen. (*Id*.) It was also noted that Claimant described neuropathy-type symptoms of dropping objects due to his lack of grip, and he reported that activities of daily living worsened this pain. (*Id*.) The assessment was polyarthralgia, psoriasis, and episcleritis. (TR. 123.) An x-ray of Claimant's SI joint from September 9, 2019 showed mild sacroiliac joint osteoarthritis without erosive changes as well as mild bilateral osteoarthritis with aspherical femoral head and neck junction, consistent with femoroacetabular impingement. (TR. 135.)

Dr. Aljasmi treated Claimant on June 16, 2020, at the Erma Byrd Center, where it was noted his active problems were anxiety, depression, liver cirrhosis, thrombocytopenia, and excessive daytime sleepiness. (TR. 38.) The assessment was obstructive sleep apnea. (TR. 41.)

### C. Evaluations

On April 5, 2018, Claimant underwent a psychological evaluation by a licensed psychologist, Kelly Robinson, M.A. (Tr. 2168-2172.) Claimant appeared with good

grooming and hygiene, walked with a normal gait, had good use of his limbs, and had no apparent vision, hearing, or speech problems. (Tr. 2168.) On examination, Claimant was alert and oriented to person, place, and time. (Tr. 2170.) His mood was dysphoric, but his affect was broad and reactive, and his thought processes appeared logical and coherent. (Tr. 2170.) He displayed no indications of delusions, obsessive thoughts, or compulsive behaviors; his insight was fair, and his judgment was within normal limits. (*Id.*) Further, Claimant's concentration and persistence, as well as his immediate and recent memory, were within normal limits, although he had some difficulty with his remote memory and his pace was slow based on his response times. (*Id.* at 2171-72.) Claimant reported regular activities including taking care of his infant son daily, going to counseling and church with his family weekly, and going to the doctor and Walmart with his family monthly. (*Id.*)

On April 14, 2018, Claimant underwent a consultative physical examination conducted by Karen Jewell, APRN, who noted that Claimant followed commands without difficulty. (Tr. 2174-75.) Claimant reported he had significant vision problems, but was observed to have 20/30 vision without correction, and his visual fields were normal. (Tr. 2175.) Claimant was able to ambulate without the use of assistive devices, his gait was steady, and he did not have difficulty transferring from the chair to the examination table; further, he did not change positions during the examination to achieve comfort, and he appeared comfortable sitting and laying down. (*Id.*) Claimant's intellectual functioning appeared normal during the examination, and his recent and remote memory were intact. (*Id.*) Claimant's elbows and wrists were non-tender, and his hands showed no swelling, tenderness, or redness. (*Id.* at 2176.) There was no muscle atrophy, and Claimant could make a fist bilaterally. (*Id.*) He would write with his dominant hand and use either hand to pick up a paperclip without difficulty. (*Id.*) Carpal tunnel testing was negative, and he

had full range of motion in his fingers bilaterally. (*Id.*) The APRN noted tenderness over Claimant's bilateral sacroiliac joints, but his lower extremities showed no fluid, crepitus, redness, or tenderness; further, his cervical spine revealed no tenderness or muscle spasm, and his dorsolumbar spine revealed normal curvature with no muscle spasm or tenderness. (*Id.*) Further, the APRN noted that Claimant was able to stand on one leg without losing balance, and he could bend forward at the waist to approximately thirty degrees. (*Id.*) He was found to be neurologically intact, and displayed full (5/5) muscle strength in all extremities bilaterally. (*Id.*) His sensory modalities appeared to be preserved, and his reflexes were unremarkable. (*Id.* at 2177.) Claimant was also able to demonstrate tandem gait, tip toe walking, and heel walking. (*Id.*)

On May 7, 2018, as part of the initial benefits consideration, State agency medical consultant Saima Noon, M.D., reviewed Claimant's medical records and issued an RFC evaluation. (Tr. 422.) Based on her review of the medical records, Dr. Noon found that Claimant's formal and informal allegations were not severely functionally limiting. (*Id.*) Accordingly, Dr. Noon found that Claimant was not limited in lifting, carrying, standing, sitting, pushing, or pulling, and he had no postural, manipulative, visual, communicative, or environmental limitations. (*Id.*)

Also part of the initial benefits determination, on May 8, 2018, State agency psychological consultant Philip E. Comer, Ph.D., reviewed Claimant's medical records and issued a mental RFC evaluation (Tr. 423-25.) Dr. Comer wrote that Claimant was not significantly limited in his ability to understand, remember, and carry out short and simple instructions, sustain an ordinary routine without special supervision, work in coordination with others without distraction, make simple work-related decisions, ask simple questions or request assistance, get along with coworkers, and maintain socially

appropriate behavior (Tr. 423-24.) Dr. Comer found that Claimant had moderate restrictions in his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday without psychologically based interruptions, interact appropriately with the general public, accept instructions from supervisors, respond appropriately to changes in the work setting, and travel to unfamiliar places or use public transportation (*Id.*)

Additionally, as part of the benefits decision reconsideration process, on June 18, 2018, State agency medical consultant Palle Reddy, M.D., reviewed Claimant's medical records and issued an RFC evaluation on June 18, 2018. (Tr. 458-60.) Dr. Reddy found that Claimant was capable of occasionally lifting and/or carrying up to fifty pounds, frequently lifting and/or carrying up to twenty-five pounds, standing and/or walking about six hours in an eight-hour workday, and sitting about six hours in an eight-hour workday (Tr. 458). Dr. Reddy further found that Claimant could frequently climb ramps/stairs, balance, kneel, crouch, and crawl, and occasionally climb ladders/ropes/scaffolds, and stoop. (Tr. 458-59.) Additionally, Dr. Reddy concluded that Claimant had no manipulative, visual, or communicative limitations, but he should avoid concentrated exposure to extreme temperatures, noise, vibration, pulmonary irritants, and hazards. (Tr. 459.)

Also part of the benefits decision reconsideration process, on June 16, 2018, State agency psychological consultant Paula J. Bickham, Ph.D., reviewed Claimant's medical records and issued a mental RFC evaluation. (Tr. 460-62.) Dr. Bickham's findings were consistent with Dr. Comer's mental RFC evaluation. (Tr. 460- 62.)

### D.  <u>Vocational Expert Hearing Testimony</u>

During the administrative hearing, the ALJ heard testimony from a vocational expert ("VE"). (Tr. 407-411.) She first asked the VE to classify Claimant's past work, and the VE responded that Claimant previously performed skilled work in three positions as a sheet metal worker, with two positions at the light exertional level and one position at the heavy exertional level, although the sheet metal worker jobs were classified at the medium exertional level. (Tr. 408.) Further, the VE testified that Claimant previously performed unskilled work as a commercial or institutional cleaner at the light exertional level, although the job was classified at the heavy exertional level. (*Id.*) Finally, the VE testified that Claimant previously performed semi-skilled work as a material handler at the heavy exertional level. (*Id.*)

The ALJ then asked the VE to imagine a hypothetical individual with Claimant's age, education, and work history who was limited to a range of medium work, can frequently climb ramps and stairs, balance, kneel, crouch, and crawl, can occasionally stoop and climb ladders, ropes or scaffolds, should avoid more than occasional exposure to temperature extremes and vibration, and can occasionally work at unprotected heights or around moving machinery. (Tr. 408-409.) The VE testified that the cleaner position would still be available to such an individual as actually performed but not as generally performed, and that such an individual could not perform Claimant's past work as a sheet metal worker and material handler. (*Id.* at 409.) However, the VE testified that such an individual could work as a linen room attendant, laundry worker I, and press tender. (*Id.*)

Next, the ALJ asked the VE to imagine another hypothetical individual with the same limitations as the first, except he could perform simple, repetitive tasks in the routine setting that involves occasional interaction with others. (*Id.*) The VE testified that

such an individual could perform in the same manner as the first hypothetical individual. (*See id.* at 410.)

Finally, the ALJ asked the VE to imagine another hypothetical individual with the same limitations as the second, except he would be off task 15% of the workday. (Tr. 410.) The VE testified that such an individual could not perform Claimant's past relevant work and could not perform any other work available in the national economy because employers will tolerate a maximum off task grade of no greater than 10%. (*Id.*)

Lastly, the ALJ asked the VE if her testimony was consistent with the *Dictionary of Occupational Titles* ("DOT"), and the VE responded that it was, except the DOT does not address off-task rates. (*Id.*) Further, the VE testified that the DOT does not split between the climbing ramps and stairs and ladders, ropes, and scaffolding, but rather addresses those tasks as climbing altogether. (*Id.*) The ALJ also gave Claimant's counsel an opportunity to examine the VE, but counsel declined. (*Id.* at 410-411.)

### E.    **Sequential Evaluation Process**

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v.*

*Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the

fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as

a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. 146.) She further determined that Claimant did engage in substantial gainful activity during limited time periods between the alleged onset date of August 22, 2013, through February 28, 2015. However, the ALJ determined that Claimant's earnings

between February 28, 2015 and the date of the ALJ's decision "were not at the level of substantial gainful activity," and therefore she directed her remaining findings to the latter time period. (*Id.*) She found that Claimant's alcoholic polyneuropathy, venous insufficiency, and spine disorder constituted "severe" impairments. (*Id.*) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 149.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform medium work" with certain exceptions. Specifically, the ALJ determined that Claimant:

> can occasionally stoop and climb ladders, ropes or scaffolds . . . can frequently climb ramps or stairs, balance, kneel, crouch, and crawl . . . should avoid more than occasional exposure to temperature extremes and vibration . . . [and] can occasionally work at unprotected heights and around moving machinery.

(Tr. 151.)

The ALJ concluded that given the limitations imposed by Claimant's RFC, he was unable to perform his past relevant work. (Tr. 155.) She noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [wa]s not material to the determination of disability." (Tr. 155.) Because the ALJ determined that Claimant was unable to perform the full range of medium work, she enlisted a vocational expert ("VE") to aid her finding that Claimant is capable of working as a linen room attendant, laundry worker, and press tender. (Tr. 156.) As a result, the ALJ concluded that Claimant was not disabled during the relevant time period under either section 1614(a)(3)(A) or 216(i) and 223(d) of the Social Security Act. (*Id.*)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by

substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    **ANALYSIS**

Claimant's challenge of the ALJ's decision set forth in his motion *sub judice* is fourfold. (ECF No. 18 at 12.). First, Claimant argued that the ALJ "failed to properly consider" his subjective complaints of pain. (*Id.* at 10.) Second, Claimant argued that the ALJ failed to consider the evidence of Claimant's "non-exertional disabilities" including his persistent depressive disorder, generalized anxiety disorder, intermittent explosive disorder, and attention deficit hyperactivity disorder (collectively, Claimant's "mental-health impairments"). (*Id.* at 11.) Third, Claimant argued that the ALJ failed to properly consider "the combination of Mr. Spurlock's impairments." (*Id.*) Fourth and finally,

Claimant argued that the ALJ "failed in her duty to produce evidence sufficient to rebut the presumption of disability." (*Id.* at 12.) The Court addresses each argument in turn.

### A.  Claimant's Subjective Complaints of Pain

Claimant first challenges the Commissioner's decision on the basis that ALJ Wells "failed to properly consider Mr. Spurlock's pain." (ECF No. 18 at 10.) He noted that under the circumstances, the ALJ was required to "consider the claimant's testimony as to the severity and effects of the pain in making a determination as to whether or not the claimant is disabled." (*Id.*) (citing *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989)). Furthermore, Claimant noted that he is not required to "provide objective evidence of the pain" for his subjective complaints to be considered. (*See id.*) (citations omitted). Because Claimant "underwent a rhizotomy, injections, and physical therapy," he concludes that "[i]t is mind boggling what else Mr. Spurlock must do to convince the [ALJ] that he has severe impairments which prevent him from working." (*Id.* at 11.)

The ALJ must assess a claimant's subjective complaints about the extent of his functional limitations in light of the objective medical evidence and other factors, such as his treatment history, medications, work history, and daily activities. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 16-3p, 2016 WL 1119029 (S.S.A.). The ALJ uses a two-step process when considering a claimant's symptoms. 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). First, Claimant must provide objective medical evidence showing a medical impairment that could reasonably be expected to produce the pain or other symptoms at issue. 20 C.F.R. §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent that they limit his ability to do basic work activities. 20 C.F.R. §§ 404.1529(c), 416.929(c). "Objective medical evidence . . . is a useful

indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms . . . ." *Id.* Other relevant information includes what may precipitate or aggravate the symptoms, medication and treatments, and daily living activities. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). An ALJ's assessment of a claimant's subjective complaints under this two-step framework is "'virtually unreviewable' by this court on appeal." *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010) (citing *Bieber v. Dep't of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002)).

Here, it is telling that Claimant's conclusory assertions are not accompanied by any citation to ALJ Wells's decision.  ALJ Wells followed the two-step process precisely and directly addressed Claimant's reports of pain pursuant to this framework. (Tr. 151-52.) In finding that Claimant's statements concerning the intensity, persistence, and limiting effects of his pain were not entirely consistent with the evidence in the record, the ALJ thoroughly explained why inconsistencies in Claimant's testimony, as well as reports to the agency, contradictory medical evidence, and his course of treatment detracted from the reliability of Claimant's subjective complaints of pain. (Tr. 152-54.) The ALJ's detailed explanation and pinpoint citations to the record evidence including Claimant's treatment history, medications, work history, and daily activities demonstrates that the ALJ's findings are supported by substantial evidence. (*See id.*)

The only specific evidence Claimant's motion points to in support of his argument is that he "underwent a rhizotomy, injections, and physical therapy." (ECF No. 18 at 10.) However, the ALJ specifically addressed these facts and explained the reason for her conclusion that the record did not support Claimant's subjective complaints of pain. For instance, the ALJ noted that, during 2014, when Claimant continued to claim disabling limitations, treatment records indicate he was capable of performing medium or even

heavy work. (*Id.*) (citing Tr. 1228, 1237.) The ALJ noted that, during a physical therapy session on April 18, 2014, Claimant specifically reported his back pain had decreased and range of motion had improved. (152.)

The ALJ further noted that, in 2015 after Claimant was no longer performing substantial gainful work, Dr. Spurlock recorded that Claimant reported no musculoskeletal symptoms and demonstrated normal gait and stance. (Tr. 153) (citing Tr. 1651, 1655, 1659, 1663.) In September 2015, Claimant reported only mild intermittent pain and that he rarely used medication. (Tr. 153) (citing Tr. 1668.) Claimant reported on December 14, 2016, and many other dates, that he was feeling fine. (Tr. 153) (citing Tr. 2273.) Additionally, a January 2018 MRI of Claimant's lumbar spine showed only low grade degenerative disc disease with a diffuse disc bulge and no acute findings. (Tr. 153) (citing Tr. 2377.) The ALJ further noted that, during Claimant's consultative examination with the APRN in April 2018, Claimant exhibited a steady gait, no spine tenderness, full (5/5) muscle strength in all extremities, and well preserved sensory modalities. (Tr. 153) (citing Tr. 2175- 77.)

The ALJ further considered that Claimant's back pain was conservatively treated during 2018 with ultrasound, electrical stimulation, and occasional pain injections. (Tr. 153) (citing Tr. 2406, 2560.) The ALJ observed that, despite Claimant's pain symptoms during this period, Claimant reported that he only took Ibuprofen for pain, and he was always lifting his "kid and baby" up and down. (Tr. 153-54) (citing Tr. 2569.) The ALJ also noted that Claimant reported during a December 2018 treatment visit that he had burning/numbness in his feet, which his medical provider attributed to alcoholic polyneuropathy and for which she prescribed Vitamin B3 and Magnesium (Tr. 154) (citing Tr. 2613.)

The ALJ went on to note that Claimant was not always compliant with medical advice, as when he reported only intermittent use of his compression stockings despite advice to use them daily. (Tr. 154) (citing Tr. 2672, 2675.) The ALJ noted that, contrary to the extreme limitations he discussed in his July 2019 testimony, treatment notes from several months earlier in February 2019 showed Claimant had a normal gait with no edema of any extremity, he demonstrated full range of motion in all extremities, and he had no sensory or motor deficits. (Tr. 154) (citing Tr. 2698.) As recently as July 16, 2019, about one week prior to the hearing, Claimant reported doing "pretty well," and despite reporting that he was in a go-kart accident while on vacation, he was able to ambulate normally, and he had normal curvature of the thoracolumbar spine. (Tr. 154) (citing Tr. 2746-47.)

The ALJ also found that Claimant's reported activities of daily living were inconsistent with his allegations of disabling pain and other symptoms. (Tr. 154.) For example, Claimant reported in 2014 that he was able to work around the house and perform exercises (Tr. 154) (citing Tr. 1753.) In December 2016, Claimant indicated he could perform his activities of daily living independently (Tr. 154) (citing Tr. 2274.) He reported to Ms. Robinson that he took care of his eight-month-old son. (Tr. 154) (citing 2171-72.) He also stated that he was able to travel to church and Walmart with his family. (Tr. 154) (citing Tr. 2171-72.) Additionally, Claimant reported in December 2017 that, on a daily basis, he read, watched television, played with his five month old son, and played board games/cards. (Tr. 710.) He further reported that he liked to keep up with the news and current events, and he helped his older son with homework (Tr. 713.)

In sum, the undersigned **FINDS** that Claimant failed to meet his burden to show the ALJ's factual findings were not supported by substantial evidence or were reached

through application of an incorrect legal standard. *Hancock*, 667 F.3d at 472; *Johnson*, 434 F.3d at 653. The ALJ appropriately considered Claimant's subjective complaints of pain and other symptoms in context with the other evidence, and provided a detailed analysis demonstrating that substantial record evidence supported the ALJ's determination. While another ALJ may have reached a different conclusion, it is not this Court's role to reweigh the evidence. *Felisky*, 35 F.3d 1035; *Johnson*, 434 F.3d at 653. Accordingly, the undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings (ECF No. 18) on this basis should be denied, the Commissioner's request to affirm her decision (ECF No. 21) should be granted.

## B.    Claimant's Mental-Health Impairments

Claimant next challenges the Commissioner's decision with a single conclusory statement that ALJ Wells "failed to consider Mr. Spurlock's persistent depressive disorder, generalized anxiety disorder, intermittent explosive disorder and attention deficit hyperactivity disorder ["ADHD"] on his ability to maintain gainful employment." (ECF No. 18 at 11.) Claimant fails to explain the reasoning behind, or cite to any portion of the record to support, this conclusory statement. Where, as here, a claimant's argument is no more than a single vague and conclusory statement, he "has essentially waived" his challenge to the Agency's final decision on appeal. *White v. Kijakazi*, 3:21-CV-97, 2021 WL 4256303, at *6 (Aug. 27, 2021), *report and recommendation adopted*, 2021 WL 4255629 (S.D. W. Va. Sept. 17, 2021). *See also Erline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006) (explaining that a "conclusory remark is insufficient to raise on appeal any merits-based challenge").

Claimant's challenge fails on the merits as well. Generously construing Claimant's barebones argument, he appears to assert that ALJ Wells did not consider whether the

Claimant's own testimony regarding the effect of his persistent depressive disorder, generalized anxiety disorder, intermittent explosive disorder and attention deficit hyperactivity disorder on his ability to maintain gainful employment was credible, and then adequately explain her credibility determination "by referring specifically to the evidence informing it." (ECF No. 18 at 11) (citing *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985)). Claimant also appears to assert that, in light of authority requiring the Agency to give a claimant's testimony "great weight . . . [i]f medical evidence corroborates the claimant's testimony regarding his non-exertional disabilities," the ALJ did not give Claimant's testimony sufficient weight. (*Id.*) (citing *Nanny v. Matthews*, 423 F. Supp. 548 (E.D. Va. 1976)).

Claimant's construed arguments are not borne out by the record. First, ALJ Wells expressly and extensively discussed Claimant's alleged mental health symptoms and hearing testimony, and set forth substantial evidence with pinpoint record citations supporting the finding that Claimant's testimony on work-related impairments was not credible. (Tr. 148-49.) Specifically, ALJ Wells expressly acknowledged Claimant's diagnoses, including persistent depressive disorder, generalized anxiety disorder, intermittent explosive disorder, and ADHD, but pointed to medical records that noted Claimant was stable on medication and consistently demonstrated generally normal objective findings on mental status evaluations (Tr. 148) (citing Tr. 2500, 2504, 2507, 2510, 2513, 2515, 2525, 2528, 2612, 2616, 2619, 2711, 2713, 2716, 2747, 2753-54, and 2757.) ALJ Wells further explained that, although Claimant alleged numerous cognitive deficits, during two consultative examinations his thought processes appeared logical and coherent, and his immediate memory and recent memory were noted as normal. (Tr. 148) (citing Tr. 2170-71, 2175.)

Further, while Claimant self-reported a diagnosis of intermittent explosive disorder, ALJ Wells noted that the record did not indicate the presence of objective social deficits; further, Claimant's testimony and other record evidence showed he participated in social activities such as going to church, shopping at Walmart, and taking a vacation with his family. (Tr. 149) (citing Tr. 2171-72, 2746.) The ALJ also noted that, despite Mr. Spurlock's claim of diminished concentration and attention, his hearing testimony and medical records indicated that he was able to read, watch television, and play board games (Tr. 149) (citing Tr. 710.) Neurosurgery notes and other treatment notes from Claimant's medical records indicated he was able to follow complex commands and had fair attention. (Tr. 149) (citing Tr. 829, 1539, 1542-43.) The consultative examiner's note also stated that Claimant had normal concentration and persistence with slow pace. (Tr. 149) (citing 2172-72.)

ALJ Wells further explained that Claimant's medical records demonstrated his intact judgment and insight, appropriate affect and mood; Claimant also reported that he could perform his activities of daily living independently. (Tr. 149) (citing Tr. 1539, 1542-43, 1545, and 2274.) Additional medical records demonstrate that in 2016 and 2017, Claimant regularly denied feelings of depression, hopelessness, or low self-worth. (Tr. 149) (citing Tr. 2274, 2278, 2284.) Following his April 5, 2018 psychological examination, Claimant was found to have fair insight and normal judgment (Tr. 149) (citing Tr. 2171.)

Moreover, in addition to explaining the reasons for giving less weight to Claimant's testimony on work-related impairments, the ALJ explained the evidentiary basis for her decision to discount the opinions of the state agency reviewing sources who assigned some moderate mental limitations to Claimant. (Tr. 154-55.) Based on the above facts, the ALJ found that Claimant's mental impairments did not cause more than a minimal

limitation on his ability to perform basic mental work activities (Tr. 148.) Clearly, substantial evidence supports the ALJ's finding.

In contrast, Claimant failed to point to *any* medical evidence corroborating his position regarding the effect of his non-exertional disabilities on his ability to maintain gainful employment. (*See* ECF No. 18 at 11.) Thus, he failed to demonstrate ALJ Wells afforded improper weight to Claimant's testimony under the circumstances. *See Nanny*, 423 F. Supp. 548. Moreover, Claimant failed to present any evidence supporting a finding that the ALJ's factual findings were not supported by substantial evidence or were reached through application of an incorrect legal standard. *Hancock*, 667 F.3d at 472; *Johnson*, 434 F.3d at 653. Accordingly, the undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings (ECF No. 18) on this basis should be denied and the Commissioner's request to affirm her decision (ECF No. 21) should be granted.

### C.    **Claimant's Combination of Impairments**

Next, Claimant challenges the Commissioner's decision on the grounds that ALJ Wells "failed to properly consider the combination of [his] impairments." (ECF No. 18 at 11-12.) Without pointing to any specific portion of the ALJ's decision, Claimant notes that "an individual's combination of impairments should not be fractionalized and considered in isolation, but considered in combination to determine the impact of the ability of the claimant to engage in substantial gainful activity." (*Id.*) (citing *Deloatche v. Heckler*, 715 F.2d 148, 154 (4th Cir. 1983)). Again, Claimant's vague and conclusory statement is facially insufficient, and he "has essentially waived" his challenge to the Agency's final decision on appeal. *See White v. Kijakazi*, 3:21-CV-97, 2021 WL 4256303, at *6.

Claimant's challenge fails on the merits as well. Generously construing Claimant's barebones argument, he appears to assert that additional RFC restrictions are warranted in light of the combined effect of his impairments, and the ALJ erred in failing to consider his impairments both singly and in combination. (ECF No. 18 at 11-12.) Applicable regulations require an ALJ to consider the effect of a claimant's impairments singly and in combination at steps two and three of the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Towne v. Astrue*, 3:11-CV-0959, 2012 WL 5285391, at *2 (S.D.W. Va. Oct. 25, 2012) (explaining consideration of combined impairments in sequential evaluation process).

Here, Claimant's failure to cite to the record is telling; contrary to Claimant's assertion, the ALJ explicitly considered Claimant's mental impairments both singly and in combination, and considered all of the record findings with respect to those impairments. (Tr. 148-49.) The ALJ also considered all of Claimant's impairments singly and combination at step three in the sequential evaluation process to determine that Claimant did not meet or equal a listing. (Tr. 149-50.) The ALJ thoroughly discussed the record, and there is no evidence that Claimant's impairments combined to produce greater restrictions than those found by the ALJ in the RFC. (*See id.*)

In sum, the undersigned **FINDS** that Claimant failed to meet his burden to show the ALJ's factual findings were not supported by substantial evidence or were reached through application of an incorrect legal standard. *Hancock*, 667 F.3d at 472; *Johnson*, 434 F.3d at 653. Accordingly, the undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings (ECF No. 18) on this basis should be denied and the Commissioner's request to affirm her decision (ECF No. 21) should be granted.

**D.     <u>Presumption of Disability</u>**

In his final challenge to the Commissioner's decision, Claimant contended that the ALJ failed to take the "overwhelming" evidence of his symptoms of "severe impairments . . . and their effects into account, and in doing so fail[ed] to provide sufficient evidence to rebut the presumption of disability." (ECF No. 18 at 12.) Generously construing Claimant's barebones argument, it appears he intended to posit that the ALJ's analysis lacked an adequate explanation of the weight she afforded the evidence. This is supported by Claimant's cursory reliance upon *Hudson v. Heckler*, an Eleventh Circuit case from 1985. (*See* ECF No. 18 at 13) (citing *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985)).

In *Hudson*, the ALJ merely declared that she "carefully considered all the testimony" and evidence without explaining why she discounted a report by the claimant's psychologist, or describing any consideration she gave to the claimant's impairments in combination. *Hudson*, 755 F.2d at 785-86. The *Hudson* court—nonplussed by the ALJ's *ipse dixit* declaration—aptly noted that "[t]his statement tells us nothing whatsoever—it goes without saying that the ALJ gave the testimony the weight [s]he believed should be accorded to it." *Id.* (internal quotation omitted). Rather, the ALJ's decision must "state specifically the weight accorded to each item of evidence and why[.]" *Id.* The *Hudson* court explained that, without a description of the weight an ALJ afforded to the evidence and the attendant basis for that weight, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id.* Ordering that the matter be remanded to the Agency, the *Hudson* court directed that "[o]n reconsideration the ALJ should articulate the reasons for her decision with the requisite specificity." *Id.*

Here, relying on *Hudson*, the Claimant argued—without elaborating—that the "overwhelming . . . weight of the evidence supports Mr. Spurlock's claim of disability"

32

because "[t]here is substantial evidence in the record" documenting and establishing "a long history of treatment for Mr. Spurlock's many impairments" which are "severe . . . [and] would be expected to produce the symptoms he describes." (ECF No. 18 at 12.) This argument fails for two reasons.

First, Claimant's attempt to shift the burden of proof is unavailing. The Court's role on review is not to determine whether the *Agency* met any burden of proof; as Magistrate Judge Eifert recently noted in response to this same argument, "there is no 'presumption of disability' under the Social Security Act, as Claimant suggests." *Fisher v. Saul*, 3:20-CV-290, 2020 WL 7414729, at *15 (S.D. W. Va. Dec. 1, 2020), *report and recommendation adopted*, 2020 WL 7409071 (S.D. W. Va. Dec. 17, 2020). Instead, as Judge Eifert explained, the "*claimant* is ultimately responsible for proving that he or she is disabled, and that responsibility never shifts to the Commissioner." *Id.* (emphasis added). Judicial review of the Agency's decision is limited to determining "whether the final decision of the Commissioner is based upon an appropriate application of law and is supported by substantial evidence." *Id.* (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

Claimant may not challenge the final decision by arguing the inverse—that there is substantial evidence in the record to support a finding in his favor. As the Sixth Circuit explained, "[t]he [Agency's] findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

Furthermore, unlike the ALJ in *Hudson*, here ALJ Wells articulated in great detail the weight she accorded to the evidence with express citation to the factual basis of her determination in Claimant's medical records. For example, as to Claimant's alcoholic

33

polyneuropathy, ALJ Wells acknowledged the December 11, 2017 study revealing mild bilateral ulnar neuropathy and mild carpal tunnel syndrome. (Tr. 147.) However, the ALJ explained that this evidence was given less weight in the context of subsequent objective evidence on the record indicating these impairments were not severe. (*Id.*) Specifically, ALJ Wells noted that on January 15, 2018, Dr. Tao noted the Claimant had no subjective or objective findings of carpal tunnel syndrome and thus needed no active treatment. (*Id.*) This was supported by a consultative physical examination on April 14, 2018, where Claimant exhibited 5/5 grip bilaterally, negative Tinel's and Phalen examinations, and his pronation and supination of the bilateral elbows was to 150 degrees. (*Id.*)

Similarly, the ALJ acknowledged that, because Claimant's body mass index fluctuated from an overweight to an obese classification, she must consider the potential impact of obesity in causing or contributing to co-existing impairments. (*Id.*) However, ALJ Wells went on to explain that this consideration was given less weight because "there is no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning." (*Id.*)

ALJ Wells likewise explained why she found that the State agency psychological consultants' findings as to Claimant's mental/emotional capacity for work were "not persuasive." (Tr. 148.) Specifically, the ALJ found—based upon specific citations to Claimant's medical records—that the psychological consultants' findings "were not consistent with [Claimant's] treatment history and are not supported by the Claimant's objective findings in primary care records and consultative psychological evaluation [which] reflect no more than mild limitation in any area." (*Id.*) Additionally, the ALJ noted that Claimant "is maintained conservatively with medication prescribed by a primary care physician and no reported side effects." (*Id.*) ALJ Wells went through this

same detailed process to explain why she gave less weight to the opinion of Eric Cooper, D.C., and the State agency medical consultant who reviewed the record on May 7, 2018. (Tr. 152, 154.)

Similarly, ALJ Wells demonstrated extensive record evidence in great detail to support her finding that Claimant's "medically determinable mental impairments . . . considered singly and in combination, do not cause more than minimal limitation in the Claimant's ability to perform basic mental work activities and are therefore nonsevere." (*Id.*) The ALJ set forth the four areas of mental functioning known as the "paragraph B" criteria and pointed to specific portions of medical records, medical imaging, a consultative psychological evaluation, a consultative physical examination, and Claimant's own representations to support this determination. (Tr. 148-155.)

Even applying the Eleventh Circuit standard in the *Hudson* opinion relied upon by Claimant, it is clear that ALJ Wells did more than simply make an unsupported declaration—like the ALJ in *Hudson*—that she properly considered all the evidence; rather, ALJ Wells articulated the reasons for her decision with specificity in great detail, including an explanation for giving less weight to certain evidence. *Hudson*, 755 F.2d at 785-86. In response to ALJ Wells's detailed explanation of her findings and direct citation to the factual basis in the record to support her findings, Claimant failed to point to *any* conflicting evidence—let alone "overwhelming" evidence—to support his conclusory argument. (*See* ECF No. 18.) A vague challenge to the ALJ's determination, without more, falls far short of Claimant's burden when, in contrast, the ALJ's determination is supported by substantial evidence in the record.

In sum, the undersigned **FINDS** that Claimant failed to meet his burden to show the ALJ's factual findings were not supported by substantial evidence or were reached

through application of an incorrect legal standard. *Hancock*, 667 F.3d at 472; *Johnson*, 434 F.3d at 653. Rather, Claimant mischaracterized the applicable legal standard in his argument that the Agency has a burden to "rebut the presumption of disability." (ECF No. 18 at 12.) Likewise, Claimant's conclusory argument that the ALJ failed to take the purportedly "overwhelming" evidence of his symptoms of "severe impairments . . . and their effects into account," (*see* ECF No. 18 at 12), is unsupported by the record. To the contrary, ALJ Wells demonstrated extensive record evidence in great detail to support her factual findings. Accordingly, the undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings (ECF No. 18) on this basis should be denied and the Commissioner's request to affirm her decision (ECF No. 21) should be granted.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse or remand the Commissioner's decision (ECF No. 18), **GRANT** the Commissioner's request to affirm her decision (ECF No. 21), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72(b) of the Federal Rule of Civil Procedure, the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such

objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: March 1, 2022

Dwane L. Tinsley
United States Magistrate Judge